**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------ x

BORIS RJAVINSKI,                                              Civil Case No. 19-cv-11459

                Plaintiff,

                **COMPLAINT**

          v.                                            **Jury Trial Demanded**

WELLS FARGO SECURITIES LLC, and MICHAEL
SCHUMACHER, in his individual and professional
capacity

                Defendants.
------------------------------------------------------------------x

      Plaintiff Boris Rjavinski ("Plaintiff"), by and through his undersigned counsel, Barton

LLP, as and for his Complaint in this action against Defendant Wells Fargo Securities LLC ("Wells

Fargo" or "Defendant") and Michael Schumacher (together "Defendants"), hereby alleges as

follows:

## PRELIMINARY STATEMENT

    "With respect to Russian language references there is nothing demeaning or humiliating in the
use of those basic terms ['da', 'nyet'].  In fact, I think it is more reasonable to interpret such
usage as a sign of ***respect*** to a colleague . . . Similarly, being referenced [*Boris* Dostoyevsky]
using the name of one of the great Russian authors of the 19th century should not be construed as
harassing."

    -   Harley Jones, Esq., Senior Employment Counsel for Wells Fargo

    1.    It's a form of "respect"; not discrimination.  Wells Fargo used that preposterous

explanation in concluding its purported investigation into Plaintiff Boris Rjavinski's

complaints about enduring years of ethnic slurs and taunts, religious bias, and other

discriminatory conduct because he is a Jewish Russian immigrant with an Eastern European

accent.

2.      Over the course of his employment with Wells Fargo's Fixed Income Research Division as a Senior Investment Strategist, Mr. Rjavinski was repeatedly mocked in person, via email, and Bloomberg Instant Messaging, through repeated uses of common Russian words such as "da" and "nyet."  One salesperson taunted him with the word "vodka" in instant messages.  Another Wells Fargo employee told him to "watch out for a subpoena from Robert Mueller."  He saw his research ridiculed as "fake news of the Russian variety." Even his manager, Mr. Schumacher, the Managing Director and Head of Rates Strategy, joined in by mockingly referring to him as "Boris Dostoyevsky."

3.      Despite a long-track record of success with Fortune 50 companies and as a Wall Street analyst, appearing in live television interviews including CNBC and dozens of media interviews, Wells Fargo baselessly forced Mr. Rjavinski to enroll in a remedial "Russian Accent Minimization" program and then ultimately relied on his accent as the purported basis for denying him a promotion to the coveted rank of Managing Director.

4.      In addition, Mr. Rjavinski was repeatedly denied professional opportunities such as client meetings and interactions on the basis of his religion.

5.      The work environment became so hostile and humiliating that Mr. Rjavinski was forced to take a medical leave of absence in March 2019.

6.      On or about April 2019, while on leave, Mr. Rjavinski mustered the courage to lodge his first formal complaint of discrimination with Wells Fargo.

7.      On or about July 2, 2019, Wells Fargo purportedly completed its investigation of Mr. Rjavinski's allegations and that "no violation of Wells policy [was] found."  Wells Fargo's in-house attorney "doubled-down" on the Bank's assertion that there was no violation of policy by preposterously putting lipstick on a pig - "**with respect to Russian language references,**

there is nothing demeaning or humiliating in the use of those basic terms ['da', 'nyet']. In fact, [ ] it is more reasonable interpret such usage as a sign of respect to a colleague . . . Similarly, being referenced [*Boris* Dostoyevsky] using the name of one of the great Russian authors of the 19th century [Fyodor Dostoyevsky] should not be construed as harassing."

8.      On or about July 8, 2019, Mr. Rjavinski returned to work following his leave of absence, yet his current position is now a mere shell of the one he held prior to complaining about discrimination.  Among other things, Mr. Rjavinski has been banished from client and media interactions and his trade ideas are no longer solicited.

9.      Despite Wells Fargo's representations and much-touted internal policies, Mr. Rjavinski continues to face career-ending retaliation and suffers physical and emotional distress due to the Bank's unlawful conduct.

10.      Mr. Rjavinski, through counsel, has repeatedly complained of ongoing harassment and demanded Wells Fargo cease and desist.  It did not.  In fact, on July 8, 2019, Mr. Rjavinski filed a charge of discrimination with the Equal Employment Opportunity Commission. Despite his filing of a Charge of Discrimination, the retaliation continued.  On September 13, 2019, counsel for Mr. Rjavinski sent Wells Fargo a draft federal court complaint alleging discrimination and retaliation under New York law and the Family Medical Leave Act of 1993, 29 U.S.C. §§ 2601, *et seq.*   Despite receiving the draft complaint, the retaliation continued.

11.      On October 21, 2019, his first day as Chief Executive Officer and President, Charles W. Scharf emailed Wells Fargo's employees describing areas of focus for the Bank. Among them was "[o]ur people set us apart" and "creating a truly diverse and inclusive company where our diversity will drive us to the best ideas and outcomes possible."

12.     In addition to continuing to endure the equivalent of a professional solitary confinement, a mere two days after Mr. Scharf's email to employees, one of Wells Fargo's Salespeople who had taunted Mr. Rjavinski in the past with humiliating Russian terms sent him an instant message with the Russian word "Nastorovia (sic)", an unambiguous reference to the stereotype of Russians as alcoholics.

13.     Apparently, even its  new CEO is powerless against the deep-rooted discriminatory mindset embedded in and enabled by Wells Fargo's culture.

14.     As a result of Defendants' unlawful discriminatory and retaliatory treatment of Mr. Rjavinski, he files this Complaint pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq*. ("Title VII"), the Family Medical Leave Act of 1993, 29 U.S.C.§§ 2601, *et seq.*,  the New York State Human Rights Law ("NYSHRL"), N.Y. Executive Law §§ 290 *et seq.*, and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Administrative Code §§ 8-101 *et seq.*

## ADMINISTRATIVE PREREQUISITES

1.     Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and received a Notice of Right to Sue on or about September 26, 2019.

2.     Plaintiff files this Complaint within 90 days of his receipt of the Notice of Right to Sue.

3.     After commencement of this action, a copy of this Complaint will be served on the New York City Commission on Human Rights and the Office of the Corporation Counsel of the City of New York, thereby satisfying the notice requirements of the New York City Administrative Code.

4.     Any and all other prerequisites to the filing of this suit have been met.

## PARTIES

5.      Plaintiff Boris Rjavinski is a resident of New York City.  At all relevant times, he met the definition of "employee" or "eligible employee" under all applicable statutes.

6.      Defendant Wells Fargo Securities LLC is a registered futures commissions merchant and broker dealer, and a subsidiary of Wells Fargo & Co., a global banking and investment company.  Wells Fargo Securities LLC is a limited liability company organized and existing under the laws of Delaware with offices located at in New York, New York.  At all relevant times, Wells Fargo met the definition of "employer" under all applicable statutes.

7.      Defendant Michael Schumacher is a resident of the State of New York  and a Managing Director, Head of Rates Strategy, of Wells Fargo.  At all relevant times, Defendant Schumacher met the definition of Mr. Rjavinski's "employer" under all relevant statutes.

## JURISDICTION AND VENUE

8.      The Court has subject matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. §1331 because this claim arises under the laws of the United States. Pursuant to 28 U.S.C. §1367(a), the Court has supplemental jurisdiction over Plaintiff's related to claims arising under State and local law.

9.      Venue is proper in this district pursuant to 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to this action, occurred in this district.

## FACTUAL ALLEGATIONS

### Background

10.     Mr. Rjavinski is a 51 year old seasoned financial services research strategist.

11.     He joined Wells Fargo in December 2015.  Over the past two decades, he had previously held prestigious positions with Citigroup, General Motors and UBS. Yet almost

immediately after joining Wells Fargo, he began to face discrimination and harassment the likes of which he had never experienced since immigrating to this country over 25 years ago.

12. After only a few months with Wells Fargo, Mr. Rjavinski began to hear colleagues openly mock his accent, deliberately mispronounce his surname, and make off-color "jokes" regarding deeply offensive stereotypes of Russian behavior, such as consumption of vodka.

13. Mr. Rjavinski soon learned that some of his colleagues, such as one on the New York sales desk, would mercilessly mock his accent during each and every interaction that they had; on one occasion this colleague warned that Mr. Rjavinski should, "*watch out for a subpoena from Robert Mueller.*"

14. In an example of how a toxic environment of discrimination can infect anyone at any level, Mr. Schumacher – Mr. Rjavinski's former boss at UBS with whom he believed he had a trusted relationship – soon joined in with making disrespectful comments, such as peppering his texts and chats with crude phrases in Russian and referring to Mr. Rjavinski as "*Boris Dostoyevsky.*"

15. Mr. Rjavinski suffered many examples of the way in which a permissive corporate culture towards discrimination and harassment will trickle down to infect the entire company. By way of example, his writing was constantly degraded by colleagues and superiors, despite the fact that his command of written English being on par with or even stronger than many of his peers who spoke English as a first language. Indeed, a single typo would result in criticism whereas colleagues' error-ridden drafts would receive no such comments.

16. On other occasions, serious, legitimate comments regarding Russian geopolitics and its effect on the markets would result in ridicule and mockery. By way of example, Mr. Rjavinski wrote a research note on geopolitics, which included a short rundown of upcoming

Russian elections, which led to his being openly mocked on internal instant messages: "***Russian elections…lol…I can tell who wrote the note.***"

17.     On another occasion, Mr. Rjavinski suggested that a search on geopolitical threats should include a term or two related to Russia.  In response, Mr. Schumacher publicly sneered "***Why not.  For Russia users: Borscht***."

18.     In January 2019, Mr. Rjavinski's colleague, also supervised by Mr. Schumacher, derisively referred to one of his research notes as "***fake news of the Russian variety***" in front of four (4) other colleagues.

19.     In March 2019,  Mr. Rjavinski misspoke on a group chat with about 200 people, including Mr. Schumacher.  The comment was pounced upon by a colleague who responded "***VODKA***?" to his small error, impugning his character as nothing more than an alcoholic Russian.

**Mr. Rjavinski's Supervisor Discriminates Against Him Based on His Religion**

20.     Russian immigrant was not the only characteristic that was used against Mr. Rjavinski at Wells Fargo.  Incredibly, the fact that he is Jewish and devoutly observes major Jewish holidays became another way that the Firm turned the workplace into a nightmare.

21.     By way of example, in September 2016 Mr. Rjavinski requested permission to take a trip to Denver with two colleagues in order to meet four high-profile clients.  Mr. Schumacher denied Mr. Rjavinski permission to attend based explicitly on the fact that the Jewish high holiday of Rosh Hashanah fell a few days after he was set to return from the Denver trip.  Because he would be out of the office to observe the holiday, Mr. Schumacher denied permission to take the earlier occurring client trip.

22.     In effect, Mr. Schumacher attempted to force Mr. Rjavinski to choose between observance of one of the holiest holidays in the Jewish religion, or to take the important client

trip. Mr. Rjavinski recognized this behavior for what it was: deep discrimination against Jewish individuals and a sign that he should be cautious in requesting accommodation for his religious beliefs and observances.

23.     This treatment made Mr. Rjavinski ashamed to raise his religion or devoutness, as it was clear that his religiosity was interpreted by his superiors as making him a disposable, less valuable addition to the team.  At every turn, Mr. Schumacher chose to denigrate Mr. Rjavinski's observation of Jewish holidays in humiliating fashion.

24.     By way of further example, in April 2017, Mr. Schumacher initially refused to allow Mr. Rjavinski to take Passover week to observe the holiday's unique dietary restrictions and participate in religious rituals.  Unfairly, Mr. Rjavinski had to insist that he be permitted to observe the holiday, leading Mr. Schumacher to express his displeasure with Mr. Rjavinski's insistence.

25.     Mr. Rjavinski was so intimidated and disheartened by that experience that he did not even consider asking for the time off for Passover in April 2018.  Of course, such a conversation would be inconceivable in the context of a Christian employee and the week of Christmas.

26.      Once again, in September 2018, Mr. Schumacher singled Mr. Rjavinski out to humiliate him for his observance of Yom Kippur, accusing him of "skipping" a client trip to Japan and cruelly stating that "if you decide to change your mind and you are willing to travel and do meetings on the Holiday, you are welcome to join" – knowing full well that Mr. Rjavinski is observant and could not simply "decide" to travel to Japan on Yom Kippur.

27.     Mr. Schumacher's desire to punish Mr. Rjavinski for his observance of Jewish holidays and his unwillingness to accommodate his religious beliefs directly resulted in fewer

client meetings for Mr. Rjavinski.  This outcome would have been completely avoidable with a modest amount of understanding and creativity from Mr. Schumacher and others in management at the Firm.  Indeed, Mr. Rjavinski's solutions to these "problems" were simply ignored.

28.     Rather than put aside his discriminatory animus towards Mr. Rjavinski as an observant Jew, Mr. Schumacher chose to hurt the Firm and Mr. Rjavinski's career.  It became clear that over time, Mr. Schumacher's discriminatory opinion of Mr. Rjavinski only grew more biased, as he erroneously perceived that Mr. Rjavinski was choosing religious observances over clients.

### Mr. Rjavinski is Denied Promotion Due to His National Origin and Accent

29.     Despite a long-track record of success with Fortune 50 companies and as a Wall Street analyst, a number of live television appearances including on the business television network CNBC, dozens of media interviews in USA Today, The Financial Times, and other top tier publications, Wells Fargo baselessly forced Mr. Rjavinski to enroll in a humiliatingly remedial "Russian Accent Minimization" program.

30.     In a turn of events that shocked Mr. Rjavinski to his core, Wells Fargo denied him a well-deserved promotion to Managing Director based entirely on his status as an immigrant from Russia with English as a second language.

31.     In January 2017, top leadership at Wells Fargo, including Mr. Schumacher, held a meeting to discuss whether to promote Mr. Rjavinski.

32.     Incredibly, as Mr. Schumacher later informed him, the promotion committee held a long discussion over whether Mr. Rjavinski's accent was an impediment to effective client presentations.

33.     Despite acknowledging his high level of expertise, exemplary work ethic, and contribution to the Firm's business, as well as the extremely high quality of his research, the promotion committee decided that due to Mr. Rjavinski's status as an immigrant with an accent, he was not Managing Director material.

34.     The promotion committee went further, criticizing Mr. Rjavinski's relatively low client interactions compared with his peers. As explained above, however, Mr. Schumacher had consistently forced Mr. Rjavinski to choose between observance of religious holidays and client meetings.  Again, this information came not from a friend or peer of Mr. Rjavinski, but ***directly from Mr. Schumacher***, who was a participant in the conversation.

35.     To make matters worse, Mr. Schumacher, who directly participated in the discriminatory action, seemed to believe that the promotion committee had come to the correct conclusion by refusing to promote Mr. Rjavinski based on his status as an immigrant with English as a second language.  He neither apologized to Mr. Rjavinski for this appalling decision nor attempted to huddle with Mr. Rjavinski to brainstorm ways to improve his chances for promotion in the future.

36.     In September 2017, Mr. Rjavinski asked Mr. Schumacher for the opportunity to re-apply for the Managing Director promotion.  In the nine (9) months since the discriminatory denial of his promotion, Mr. Rjavinski had done all he could to address the issues that the promotion committee had raised.

37.     By this time, Mr. Rjavinski gathered numerous references from colleagues and clients regarding the strength of his presentations and business-generating impact with clients. Nonetheless, Mr. Schumacher flatly told Mr. Rjavinski "not to bother" to apply for the promotion

because Mr. Rjavinski was "not on the list of candidates." He did not elaborate or attempt to assist Mr. Rjavinski in any way.

38.     Unfortunately, Mr. Rjavinski's treatment is emblematic of Wells Fargo's culture as a whole. It is sadly unsurprising, based on the cruel and discriminatory harassment that Mr. Rjavinski was subjected to each and every day, that only a single Managing Director in Wells Fargo's research/economics field is an immigrant with English as a second language – and that individual was hired laterally, coming to Wells Fargo with the Managing Director title.

39.     In other words, Wells Fargo has not promoted to Managing Director a single individual with a similar background to Mr. Rjavinski's in many years. This is easily explained by the fact that Wells Fargo, its management, and its rank-and-file employees regard immigrants as less-than: inferior in intelligence, subpar in commitment to the firm, and handicapped in client relations.

40.     Based on his treatment by Defendant, Mr. Rjavinski began to experience among other things, severe anxiety and depression.

41.     As Mr. Rjavinski informed his mental health provider, these symptoms were caused directly by the abuse he suffered at Wells Fargo. Indeed, before he started working with Defendant, he did not have a history of any of these symptoms.

42.     As a result of the escalating nature of his symptoms, Mr. Rjavinski took a paid medical leave beginning on March 27, 2019.

43.     While out on leave, Mr. Rjavinski mustered the courage and complained to Wells Fargo in detail about his treatment and the discrimination that he faced. In fact, on April 30, 2019, Mr. Rjavinski sent a detailed email to two Wells Fargo senior diversity & inclusion executives describing the discriminatory conduct he endured.

44.     It took Wells Fargo nine weeks to investigate his complaints.

45.     While its investigation proceeded at a snail's pace, Mr. Rjavinski was absent from work, no longer publishing research notes or making media appearances on television, and no longer providing market color to clients, salespeople, and traders.

46.     The damage to Mr. Rjavinski's professional career mounted daily.  While he languished at home, the perpetrators of this unlawful conduct continued to roam the Wells Fargo trading floors with impunity.

47.     In addition to his allegations of discrimination, Mr. Rjavinski feared retaliation upon his return – a fate well-documented and common among those who complain of wrongdoing at Wells Fargo.  Other than banal assurances that he would not be retaliated against, Wells Fargo offered no other concrete plan or actionable steps to protect Mr. Rjavinski and has rejected his proposals that would shield his from retaliation.

48.     More than two (2) months after his initial complaints of discrimination to Wells Fargo, Wells Fargo abruptly informed Mr. Rjavinski that it had found no violations of Company policy in his complaints.

49.     In fact, Wells Fargo's legal team actually defended the behavior described above and demanded that Mr. Rjavinski return to work on July, 8, 2019.  Harley Jones, a senior in-house employment lawyer with Wells Fargo preposterously concluded in an email that "**it is more reasonable to interpret usage [of Russian words 'da' and 'nyet'] as a sign of respect to colleague. . . . [s]imilarly, being referenced using the name of one of the great Russian authors of the 19th century [*Boris* Dostoyevsky] should not be construed as harassing.**"

50.     While Mr. Rjavinski, reluctantly agreed to return to the workplace, his fears regarding retaliation were unaddressed.  Indeed, his request to alter his reporting structure so as

to avoid further discrimination, harassment or retaliation from Mr. Schumacher was immediately denied, as was his alternative request for a new work location.

51.     This reaction to Mr. Rjavinski's reasonable requests, as well as Wells Fargo's insistence that his complaints raised absolutely no issue with their anti-discrimination policies (such as they are) heightened Mr. Rjavinski's concern that nothing would change upon his return to work.

52.     Though Wells Fargo demanded that Mr. Rjavinski return to work immediately following the close of its "investigation", the Defendant failed to even restart his email access, leaving him essentially sitting at his desk without the ability to be looped back into the day-to-day workings of Wells Fargo.

### Mr. Rjavinski Immediately Faces Retaliation for His Medical Leave and Complaints of Discrimination

53.     That same day he returned to work, Mr. Rjavinski filed his Charge of Discrimination with U.S. Equal Opportunity Commission.  Despite returning to work and filing his Charge of Discrimination, Wells Fargo disappointingly, but not surprisingly, continues to engage in its retaliatory campaign against Mr. Rjavinski.

54.     Also, on July 8, 2019, Mr. Rjavinski's counsel sent a letter to Douglas R. Edwards, Esq., Executive Vice President and Interim General Counsel of Defendant informing him of Mr. Jones' conclusions and that his legal department, the very organization charged with governing the Firm's behavior, was not only defending its discriminatory conduct – but sought to "spin" it as some positive attribute.  This is the epitome of "putting lipstick on a pig."  Wells Fargo ignored this letter from counsel.

### *Mr. Rjavinski is Banished from Client and Media Interactions*

55.     Since his return from medical leave in July, Mr. Rjavinski has had no media appearances.  Prior to his leave of absence, he was frequently featured in The Wall Street Journal, Bloomberg News, USA Today, CNBC online, Financial Times, and others.  He has also appeared on the leading business television network CNBC.  Notably, Zachary Griffiths, an Analyst with significantly less experience, has made at least a half dozen media appearances since Mr. Rjavinski's return from leave.

56.     Significantly, Mr. Rjavinski finds himself frozen out from contact with the U.S.-based and London-based Sales teams.  Despite a relatively "full plate" of client interactions and conference calls prior to his leave of absence and complaints of discrimination, those opportunities have vanished since and Mr. Rjavinski finds himself in relegated to a professional "solitary confinement" where he is essentially isolated from many of the material aspects of his employment.

57.     Mr. Rjavinski's exclusion from media and client interactions was brought into high relief in connection with the Fixed Income Research Department's monthly effort to highlight its market impact and visibility to its internal clients through a monthly conference call.

58.     Each month Wells Fargo Fixed Income hosts a monthly conference call highlighting significant client and media interactions by the Fixed Income Research team during the prior month.  This monthly call is attended by nearly every person working in Fixed Income Research as well as the Fixed Income business management team.  Approximately 150 Wells Fargo employees participate in this call.  Prior to the call, a one-page report is distributed to the participants naming the client meetings and media appearance and Fixed Income Research Analysts and Strategists involved in those interactions.

59.     George Bory, Head of Fixed Income Research, presides over this call and discussed each interaction during the call.   Notably, client and media interactions are key factors in determining how strategists like Plaintiff are compensated and play a key role in building their reputation.

60.     Notably, prior to Plaintiff's leave of absence and complaining about his mistreatment, he was a prominent feature during these Fixed Income monthly update conference calls.   Plaintiff is one of three strategists in Wells Fargo Fixed Income Rates Strategy, with Mr. Schumacher and Mr. Griffiths.

61.     The Fixed Income monthly update conference call in September 2019, which highlighted media and client interactions for August, mentioned Messrs. Schumacher and Griffiths three times.   Mr. Rjavinski was mentioned once, as part of a joint call with both Messrs. Schumacher and Griffiths.

62.     The Fixed Income monthly update conference call in October 2019, highlighting media and client interactions for September, did not mention Mr. Rjavinski at all.   Mr. Schumacher is described in five interactions and Mr. Griffiths is featured twice.   Mr. Rjavinski is not mentioned at all.

63.     In other words, since Mr. Rjavinski's leave of absence and complaining about his discrimination, Wells Fargo recognizes only two strategists in the Fixed Income group: Plaintiff has been banished.

### *Mr. Rjavinski's Money-Making Trade Ideas Are No Longer Solicited*

64.     Mr. Rjavinski's Rates Strategy team publishes specific trade ideas for its clients. Historically, Mr. Rjavinski has provided most of those trade ideas.

65.    By way of example, prior to Plaintiff's leave of absence and complaints, in March 2019, 64% of his trade ideas had a "hit ratio" or proved to be revenue generating.  Wells Fargo tracks this performance in a "paper portfolio" or spreadsheet maintained by the department.   In fact, Mr. Schumacher frequently complimented Mr. Rjavinski on his successful trading idea acumen.

66.    Since returning from his leave of absence and complaining about discrimination, however, he has not been asked by Wells Fargo for any trade ideas.  Notably, this is despite the fact that only 12.5% of the trade ideas currently being utilized have a "hit ratio".

67.    Trade ideas, like client and media interactions, are a factor in determining how strategists like Plaintiff are compensated and play a key role in building their reputation.  That Mr. Rjavinski is being denied the opportunity to provide them is simply one more way that Wells Fargo's discriminatory and retaliatory treatment is causing Mr. Rjavinski concrete harm.

### Wells Fargo Interferes with Mr. Rjavinski's Paid Time Off

68.    In addition to freezing him out of substantive work interactions, since his return to work from medical leave in July, Defendant repeatedly interfered with Mr. Rjavinski's ability to use his paid time off ("PTO") and holiday leave, in what can only be understood as retaliation against his use of medical leave and complaints of discrimination.

69.    First, after assigning Mr. Rjavinski a workload so onerous as to make it impossible for him to take a summer holiday with his family, Mr. Rjavinski's supervisor, Mr. Schumacher, has continued to use Mr. Rjavinski's PTO as a means of retaliation against him.

70.    Indeed, on August 13, 2019, Mr. Schumacher used an email from his own boss, George Bory, as a pretext to institute a new PTO policy making it effectively impossible to use

PTO going forward. To wit, Mr. Schumacher now insists that Mr. Rjavinski provide two weeks' notice to use a single PTO day and a month's notice to use one week of PTO.

71. This new policy appears to have been invented by Mr. Schumacher out of thin air, as these burdensome requirements for the use of PTO appear nowhere in Wells Fargo's detailed PTO policies, and Mr. Bory's email made no mention of a two-week lead time to use a single PTO day. In actuality, Mr. Bory's email does not mention the use of PTO at all.

72. While Mr. Schumacher's email instituting this "policy" ostensibly includes Mr. Griffiths, Mr. Rjavinski's young, recently married colleague, there can be no doubt that Mr. Rjavinski was the policy's intended target.

73. Upon information and belief, Mr. Griffiths is not expected to adhere to this policy and does not find it as punishing as Mr. Rjavinski who, in addition being married, is also a parent. In short, this so-called "policy" is a transparent attempt to retaliate against Mr. Rjavinski for his leave and complaints.

74. Three days after this change in "policy," Mr. Rjavinski received a second email, this time from Messrs. Schumacher and Bory's administrative assistant – someone who would only have sent such an email on instructions from her boss – informing Mr. Rjavinski that his paid holidays were being allocated to certain days without consulting him.

75. Around this time, Mr. Rjavinski was informed by a human resources representative that because of his use of medical leave, his two floating holidays had been revoked.

76. As explained above, Mr. Rjavinski is a practicing Jewish man who observes the major Jewish religious holidays.

77. Accordingly, he has historically worked through certain holidays, such as Columbus Day, in order to observe Jewish holidays instead.

78.     Despite Wells Fargo's insistence that Mr. Rjavinski's Jewish faith has always been respected by the firm, and personal assurances from Wells Fargo's legal team that employees had been instructed not to further interfere with Mr. Rjavinski's religious rights, Defendant went ahead and recalculated his holiday leave without consideration of his religious faith.

79.     When Mr. Rjavinski raised these issues with HR, he was told that the allocation was customary and that he would need to work through Columbus Day in mid-October in order to get a holiday day "released" back to him. This year, the Jewish Holiday of Rosh Hashanah falls this year on September 30-October 1, before Columbus Day, making this scenario unworkable.

80.     Furthermore, this is the first time in Mr. Rjavinski's time with Wells Fargo that any such policies have been invoked against him and again, is not reflected in the firm's policies. This new holiday policy, combined with Wells Fargo retroactively informing Mr. Rjavinski that his floating holidays had been revoked because of his need to use medical leave, leaves Mr. Rjavinski with few options to observe the Jewish holidays during the upcoming months.

81.     Mr. Rjavinski, repeatedly through counsel, has alerted Wells Fargo to these continuing acts of retaliation.  Wells Fargo responded with the well-worn platitude that, "we take [Mr. Rjavinski's] allegations of retaliation seriously and will investigate them."  However, there has no meaningful investigation, there are no consequences to those who are retaliating against Mr. Rjavinski, and most significantly, Mr. Rjavinski continues to languish in his role.

82.     Defendants' underlying discriminatory conduct and retaliation have tarnished Mr. Rjavinski's career and disrupted his professional trajectory.

83.     Defendants' unlawful discrimination and retaliatory conduct has caused and continues to cause emotional distress and lasting professional and financial harm.

## FIRST CAUSE OF ACTION
### (Interference in Violation of the FMLA)

84.     Plaintiff repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

85.     At all times relevant herein, Mr. Rjavinski was an "employee" within the meaning of the FMLA. At all times relevant herein, Defendant Wells Fargo was and constitutes an "employer" within the meaning of the FMLA.

86.     Defendant was obligated to provide Mr. Rjavinski with FMLA leave and were not permitted to use the taking of leave as a negative factor in employment actions.

87.     By the actions described above, among other things, Defendant violated the FMLA by unlawfully interfering with, restraining, or denying exercise of Mr. Rjavinski's rights by, inter alia, denying him equal terms and conditions of his employment and benefits.

88.     As a direct and proximate result of Defendant's unlawful conduct in violation of the FMLA, Mr. Rjavinski has suffered and continues to suffer harm for which he entitled to an award of damages, to the greatest extent permitted under law, in addition to reasonable attorneys' fees and expenses.

89.     Defendants' unlawful actions constitute bad faith, malicious, willful and wanton violations of the FMLA for which Mr. Rjavinski is entitled to an award of liquidated damages.

## SECOND CAUSE OF ACTION
### (Retaliation in Violation of the FMLA)

90.     Plaintiff hereby repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

91.     At all times relevant herein, Mr. Rjavinski was an "employee" within the meaning of the FMLA. At all times relevant herein, Defendant Wells Fargo was and constitutes an "employer" within the meaning of the FMLA.

92.     Defendant was obligated to provide Mr. Rjavinski with FMLA leave and was not permitted to use the taking of leave as a negative factor in employment actions.

93.     Defendant violated the FMLA by unlawfully retaliating against Mr. Rjavinski for exercising rights protected by the FMLA by, *inter alia*, denying him equal terms and conditions of employment and benefits, thereby subjecting him to an adverse employment action that would reasonably dissuade a reasonable person from exercising rights protected by the FMLA.

94.     Defendant's unlawful actions constitute bad faith, malicious, willful and wanton violations of the FMLA for which Mr. Rjavinski is entitled to an award of liquidated damages.

95.     As a direct and proximate result of Defendant's unlawful conduct in violation of the FMLA, Mr. Rjavinski has suffered and continues to suffer harm for which he entitled to an award of damages, to the greatest extent permitted under law, in addition to reasonable attorneys' fees and expenses.

### THIRD CAUSE OF ACTION
**(Discrimination Under Title VII)**

96.     Plaintiff hereby repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

97.     Defendants have discriminated against Plaintiff on the basis of his religion and national origin in violation of Title VII, 42 U.S.C.§§ 2000e, *et seq.*, by, *inter alia*, subjecting him to disparate treatment based on his religion and national origin, including, *inter alia*, denying him equal terms and conditions of his employment and denying him a promotion.

98.     As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which he is entitled to an award of monetary damages and other relief.

99.     As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress for which he is entitled to an award of monetary damages and other relief.

100.    Defendants' unlawful and discriminatory actions were intentional, done with malice and/or showed deliberate, willful, wanton and reckless indifference to Plaintiff's rights under Title VII, for which Plaintiff is entitled to an award of punitive damages.

101.    Plaintiff is further entitled to reasonable costs and attorneys' fees.

## FOURTH CAUSE OF ACTION
### (Discrimination Under the New York State Human Rights Law)
### Against All Defendants

102.    Plaintiff hereby repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

103.    Defendants discriminated against Plaintiff on the basis of his religion and national origin in violation of the New York State Human Rights Law ("NYSHRL"), N.Y. Executive Law §§ 290 *et seq*. by subjecting him to disparate treatment based on his religion and national origin, including, *inter alia*, denying him equal terms and conditions of his employment and denying him a promotion.

104.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which he is entitled to an award of monetary damages and other relief.

105.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of NYSHRL, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress for which he is entitled to an award of monetary damages and other relief.

## FIFTH CAUSE OF ACTION
### (Discrimination Under the New York City Human Rights Law)

106.    Plaintiff hereby repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

107.    Defendants discriminated against Plaintiff on the basis of his religion and national origin in violation of the New York City Human Rights Law ("NYCHRL"), N.Y.C. Administrative Code §§ 8-101 *et seq.*, by subjecting him to disparate treatment based on his religion and national origin, including, but not limited to, denying him equal terms and conditions of his employment and denying him a promotion while working in New York City.

108.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which he is entitled to an award of monetary damages and other relief.

109.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of NYCHRL, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress for which he is entitled to an award of monetary damages and other relief.

110.    Defendants' unlawful and discriminatory actions were intentional, done with malice and/or showed deliberate, willful, wanton and reckless indifference to Plaintiff's rights under the NYCHRL, for which Plaintiff is entitled to an award of punitive damages.

111.    Plaintiff is further entitled to reasonable costs and attorneys' fees.

## SIXTH CAUSE OF ACTION
### (Retaliation Under Title VII)

112.     Plaintiff hereby repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

113.     By the actions described above, among others, Defendants have retaliated against Plaintiff by, *inter alia*, denying him equal terms and conditions of his employment, including, *inter alia*, changing the terms of his benefits and denying him media and client appearances due to his protected activity of complaining about discriminatory treatment.

114.     As a direct and proximate result of Defendants' unlawful and retaliatory conduct, Plaintiff has suffered and continues to suffer harm for which he is entitled to an award of damages, to the greatest extent permitted under law.

115.     Defendants' unlawful and discriminatory actions constitute knowing, malicious, willful, wanton and reckless violations of the Title VII for which Plaintiff is entitled to an award of punitive damages.

116.     Plaintiff is further entitled to reasonable costs and attorneys' fees.

## SEVENTH CAUSE OF ACTION
### (Retaliation Under the New York State Human Rights Law)

117.     Plaintiff hereby repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

118.     By the actions described above, among others, Defendants retaliated against Plaintiff *inter alia*, denying him equal terms and conditions of his employment, including, *inter alia*, changing the terms of his benefits and denying him media and client appearances due to his protected activity of complaining about discriminatory treatment.

119.     As a direct and proximate result of Defendants' unlawful and retaliatory conduct, Plaintiff has suffered and continues to suffer harm for which he is entitled to an award of damages, to the greatest extent permitted under law.

### EIGHTH CAUSE OF ACTION
**(Retaliation Under the New York City Human Rights Law)**

120.     Plaintiff hereby repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

121.     77.     By the actions described above, among others, Defendants retaliated against Plaintiff *inter alia*, denying him equal terms and conditions of his employment, including, *inter alia*, changing the terms of his benefits and denying him media and client appearances due to his protected activity of complaining about discriminatory treatment.

122.     As a direct and proximate result of Defendants' unlawful and retaliatory conduct, Plaintiff has suffered and continues to suffer harm for which he is entitled to an award of damages, to the greatest extent permitted under law.

123.     Defendants' unlawful and discriminatory actions constitute knowing, malicious, willful, wanton and reckless violations of the NYCHRL for which Plaintiff is entitled to an award of punitive damages.

### JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment in his favor and against Defendants for the following relief:

A.     A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate federal law and the laws of the State of New York and the City of New York;

B.     An award of damages against Defendants, in an amount determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages, including but not limited to, loss of past and future income, wages, compensation, seniority and other benefits of employment;

C.     An award of damages against Defendants, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages including, but not limited to, compensation for Plaintiff's emotional distress;

D.     An award of damages for any and all other monetary and/or non-monetary losses suffered by Plaintiff, including but not limited to, loss of income and other damages flowing from it, earned bonus pay, reputational harm and harm to professional reputation, in an amount to be determined at trial, plus prejudgment interest;

E.     An award of punitive damages and any applicable penalties and/or liquidated damages in an amount to be determined at trial;

F.     Prejudgment interest on all amounts due;

G.     An award of Plaintiff's reasonable attorneys' fees and costs; and

H.    Such other further relief as the Court may deem just and proper.

Dated:    New York, New York
          December 13, 2019

**BARTON LLP**

By: _____
          Scott G. Grubin
          Rita Lenane-Massey

711 Third Avenue, 14th Floor
New York, NY 10017
Tel.: (212) 687-6262
sgrubin@bartonesq.com
rlmassey@bartonesq.com

*Attorneys for Plaintiff*